**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| Michael Kaplan and Nina Kaplan, | : | |
| Debtors. | : | Bankruptcy No. 17-15868-MDC |

| | | |
|---|---|---|
| T. Levy Associates, Inc., | : | |
| Plaintiff, | : | |
| v. | : | Adversary No. 17-00363-MDC |
| Michael Kaplan and Nina Kaplan, | : | |
| Defendants. | : | |

# MEMORANDUM OPINION

BY: THE HONORABLE MAGDELINE D. COLEMAN, CHIEF UNITED STATES BANKRUPTCY JUDGE

## I.  INTRODUCTION

The plaintiff, T. Levy Associates, Inc. (the "Plaintiff" or "TLA"), filed this adversary

proceeding seeking a determination that the judgment debts (the "Judgments") owed to it by

Michael Kaplan ("Mr. Kaplan") and Nina Kaplan ("Mrs. Kaplan," and together with Mr. Kaplan,

the "Debtors," and both Debtors together with the Plaintiff, the "Parties") are nondischargeable

pursuant to sections §§523(a)(2)(A), 523(a)(4), and 523(a)(6) of the United States Bankruptcy

Code, 11 U.S.C. §§101, *et seq.* (the "Bankruptcy Code").[1]  The Judgments arise from a jury

verdict entered against the Debtors after a four-day trial in an action TLA brought against them

in the United States District Court for the Eastern District of Pennsylvania (the "District Court")

---

[1] My former colleague, Judge FitzSimon, presided over the Debtors' bankruptcy case and this adversary proceeding until her retirement in June 2020.  On June 26, 2020, the bankruptcy case and this adversary proceeding were reassigned to the undersigned.

and various claims under Pennsylvania law.  This Court held a two-day trial on October 19 and

21, 2020 (the "Nondischargeability Trial"), and upon the trial's conclusion took the matter under

advisement and directed the Parties to submit proposed findings of fact and conclusions of law,

which the Parties filed on December 4, 2020.[2]  After consideration of the Parties' post-trial

submissions and the evidence adduced in the District Court Action and the Nondischargeability

Trial, and for the reasons set forth below, the Court finds that the Judgments are excepted from

discharge pursuant to §§523(a)(2)(A) and 523(a)(6), but are not excepted from discharge

pursuant to §523(a)(4).

## II.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[3]

### A.    The Relationship Between the Debtors and TLA

TLA was a cosmetics and beauty wholesale supplier and retailer founded in the 1960s by

Ted Levy ("Mr. Levy"), who is the father of the Debtor Mrs. Kaplan and the father-in-law of co-

Debtor Mr. Kaplan.  Mr. Levy was the President of TLA, as well as its sole shareholder until

2009.  Mr. Levy's wife, Rosalind Levy ("Mrs. Levy"), also worked at TLA as a secretary and

bookkeeper, but did not have any ownership interest.  Sometime in or around 1982, Mr. Levy

was diagnosed with Multiple Sclerosis and began to reduce his time spent actively managing

TLA.  By the late 1990s, Mr. Levy had withdrawn from TLA's wholesale operations entirely,

and in the early 2000s he further reduced the time he spent actively managing TLA.  Mr. Levy

retired in 2003, and although he retained the title of President after he retired, he generally did

not have an active role in TLA's business.  Following his retirement, Mr. Levy purchased a

---

[2] Adv. Pro. Docket Nos. 88, 89.  The Parties' post-trial submissions are referred to herein as "Plaintiff's Post-Trial Brief" and "Debtor's Post-Trial Brief."

[3] The factual and procedural background is taken from the Parties' Post-Trial Briefs and the evidence adduced at the Nondischargeability Trial, including the District Court Transcript.

beach home in New Jersey and spent the majority of his time there.  Mrs. Levy, however, did not

retire from TLA, and continued to work two or three days per week.  Mr. and Mrs. Levy also

spent time during the year in Florida, and in 2005 or 2006 they permanently relocated there.  Mr.

Levy was the 100% owner of TLA until 2009, when he gifted 1% ownership to each of Mr.

Kaplan, Mrs. Kaplan, and Mr. Levy's other daughter, Cindy Fein ("Ms. Fein").  In 2010 he again

gifted another 1% ownership to Mr. Kaplan, Mrs. Kaplan, and Ms. Fein.

Mr. Kaplan had a long career with TLA until he was terminated in March of 2016.  Mr.

Kaplan began working for TLA in the early 1980s, and eventually married Mrs. Kaplan.  As

noted above, TLA had two divisions: its retail business was conducted through "Beauty Land"

retail stores, and its wholesale business was conducted through T. Levy Supply.[4]  Mr. Kaplan

began his career with TLA in its retail operations, but after Mr. Levy was hospitalized in or

around 1982 with Multiple Sclerosis, Mr. Kaplan took charge of TLA's wholesale business.

When Mr. Levy retired in 2003, he ceded operating control of TLA to Mr. Kaplan and gave him

full authority to take action and make decisions on behalf of the business.  By 2008, Mr.

Kaplan's title was Executive Vice President.

Mrs. Kaplan, on the other hand, did not work for TLA; instead, she operated various

stores and businesses of her own.  Beginning in 1989 or 1990, Mrs. Kaplan was the sole owner

of several retail locations selling jewelry, home accessories, and antiques, which eventually

consolidated at a single location in Newtown, Pennsylvania with a store called Angel Heart.  In

2006, Mrs. Kaplan created an entity called $Hip^2$ ("Hip Squared"), of which she was the sole

owner, to operate a store in Pennington, New Jersey selling clothing, cosmetics, and skin care

and fragrance products (the store later relocated to Princeton, New Jersey).  In 2008, Mrs.

---

[4] Neither Beauty Land nor T. Levy Supply were legally-distinct entities from TLA.

Kaplan formed BLC Beauty, Inc., a New Jersey corporation, of which she was the sole owner

("BLC New Jersey"), to operate a high-end beauty supply store named BLC Couture in

Princeton, New Jersey.  In 2010, Mrs. Kaplan formed BLC Beauty, Inc., a Pennsylvania

corporation, of which she was the sole owner ("BLC Pennsylvania"), which operated a BLC

Couture store initially out of 50%, and later out of 100%, of TLA's Beauty Land retail space in

Newtown, Pennsylvania.

### B.      The District Court Action

After Mr. Kaplan was terminated from TLA in March 2016, TLA filed a complaint in the

District Court Action against both Mr. and Mrs. Kaplan and BLC Pennsylvania, asserting that,

through various actions, they had pillaged TLA's assets for the benefit of themselves personally

and Mrs. Kaplan's businesses.  TLA alleged that one or both Debtors (i) embezzled $492,922.99

by charging that amount on TLA's American Express Card for the benefit of the Debtors

personally and to support Mrs. Kaplan's business, (ii) embezzled $224,857.66 by expending

TLA funds to purchase products for Mrs. Kaplan's business, (iii) used TLA funds in the amount

of $284,168.00 to repay personal loans from Mr. Levy to Mr. and Mrs. Kaplan, (iv) used TLA

funds in the amount of $216,269.00 to pay BLC Pennsylvania's rent, and (v) caused $200,391.00

in lost profits for calendar year 2016 by diverting TLA's long-time wholesale customers to BLC

Pennsylvania.

As noted *supra*, the Judgments were rendered against the Debtors in the District Court

Action after a four-day trial.  During that trial, both Debtors, Mr. Levy, and Ms. Fein each

testified, as did certain other individuals who were either employed by the Plaintiff or served in

an advisory or retained professional role to the Plaintiff.

The jury in the District Court Action returned a unanimous verdict in favor of TLA.  The

jury found Mr. Kaplan liable (i) in the amount of $222,087.50 for violating RICO, (ii) in the

amount of $100,000.00 for converting TLA's property, (iii) in the amount of $100,000.00 for

breach of fiduciary duties to TLA, and (iv) in the amount of $100,000.00 for tortiously

interfering with TLA's contractual relationships.  The jury found Mrs. Kaplan liable (i) in the

amount of $161,044.00 for violating RICO, and (ii) in the amount of $100,000.00 for converting

TLA's property.[5]  The damages for the RICO claims were automatically tripled.

On June 30, 2017, after the jury verdict was entered, the District Court entered the

Judgments in favor of TLA, in the amount of $966,262.50 against Mr. Kaplan, and in the amount

of $583,132.00 against Mrs. Kaplan.  On August 21, 2017, as authorized due to the Kaplans

having been found liable for violation of RICO, the District Court awarded TLA an additional

$482,959.60 in legal fees and expenses, holding Mr. and Mrs. Kaplan jointly and severally liable

for them.  As such, the total of the Judgments against the respective Debtors is $1,449,222.10

against Mr. Kaplan, and $1,066,091.60 against Mrs. Kaplan.  It is with respect to these amounts

that the Plaintiff seeks a nondischargeability determination in this adversary action.

### C.    The Complaint and the Summary Judgment Decisions in this Adversary Proceeding

On August 30, 2017, the Debtors filed their bankruptcy case under chapter 7 of the

Bankruptcy Code.  On December 13, 2017, the Plaintiff initiated this adversary action by filing a

Complaint against both Debtors to contest the discharge of the Judgments.[6]  The Complaint

asserts that the Judgments are nondischargeable under various subsections of §523(a) based on

the jury findings of liability in the District Court Action.  Count I of the Complaint alleges that

---

[5] The jury also found BLC Pennsylvania liable for violating (i) RICO, with resulting damages of $161.043.50; (ii) tortious interference with contractual relations, with resulting damages of $50,000.00; and (iii) conversion, with resulting damages of $50,000.00.

[6] Adv. Pro. Docket No. 1.

the Judgments were incurred by false pretenses, false representations, and actual fraud, rendering

them nondischargeable pursuant to §523(a)(2)(A).  Count II of the Complaint again alleges that

the Judgments were incurred by false pretenses, false representations, and actual fraud, rendering

them nondischargeable pursuant to §523(a)(4), which excepts from discharge debts for "fraud or

defalcation while acting in a fiduciary capacity, embezzlement or larceny."  Count III of the

Complaint alleges that the Judgments were incurred by willful and malicious conduct consisting

of false pretenses, false representation, and actual fraud, rendering them nondischargeable

pursuant to §523(a)(6).

### 1.    The First Summary Judgment Motion

On July 16, 2019, the Plaintiff moved for summary judgment (the "First Summary

Judgment Motion") on each count of the Complaint, relying on the application of collateral

estoppel to the jury verdict in the District Court Action.[7]  With respect to its §523(a)(2)(A)

claim, the Plaintiff argued that the jury finding the Debtors' liable for RICO violation established

actual fraud.[8]  With respect to its §523(a)(4) claim, the Plaintiff argued that the jury finding Mr.

Kaplan liable for fraud under RICO, breach of fiduciary duty, and tortious interference with

TLA's contractual relationships established fraud and defalcation in a fiduciary capacity as well

as embezzlement under §523(a)(4) not only as to Mr. Kaplan, but also to Mrs. Kaplan as his co-

conspirator.  The Plaintiff also argued that the jury finding both Debtors liable for conversion

established embezzlement.  With respect to its §523(a)(6) claim, the Plaintiff argued that the jury

finding the Debtors liable for RICO violation and Mr. Kaplan liable for tortious interference with

contractual relationships established willful and malicious injury.

---

[7] Adv. Pro. Docket No. 27.

[8] The Plaintiff did not argue that it established debt incurred by false pretenses or a false representation.

On October 4, 2019, the Court issued a Memorandum Opinion (the "First Summary Judgment Opinion") and an Order granting the First Summary Judgment Motion in part and denying it in part, based on the application of collateral estoppel to the Judgments in the District Court Action.[9]

First, the Court found that the jury verdict in favor of the Plaintiff on the RICO claims against each Debtor, based on mail and wire fraud, established (i) the culpable act by the Debtors that constitutes fraud for purposes of §523(a)(2)(A), and (ii) the wrongful intent by the Debtors that satisfies the "actual" component of "actual fraud" under §523(a)(2)(A).  The Court found, however, that with respect to the Plaintiff's §523(a)(2)(A) claim, the RICO liability verdict did not establish the remaining element of actual fraud, *i.e.*, justifiable reliance by the Plaintiff.

Second, the Court found that the jury verdict in favor of the Plaintiff on the RICO claim also established, for purposes of §523(a)(6)'s "willful and malicious injury" exception to discharge, (i) willful conduct, (ii) that was malicious.  The jury verdict did not, however, establish that the willful and malicious conduct was intended or substantially certain to cause injury, as required for a successful §523(a)(6) claim.

Finally, the Court found that the jury verdict in favor of the Plaintiff on its breach of fiduciary duty and tortious interference with contract claims, as to Mr. Kaplan only, did not establish any of the elements of the Plaintiff's claim under §523(a)(4) for "fraud or defalcation while acting in a fiduciary capacity."  The Court also found that the jury verdict in favor of the Plaintiff on its conversion claim against both Debtors did not establish embezzlement under §523(a)(4).[10]

---

[9] Adv. Pro. Docket Nos. 35, 39.

[10] It is not clear to the undersigned why the Court was even required to address whether the Judgment in the District Court Action established embezzlement under §523(a)(4) because, as noted *supra*, the

As a result of the Court's rulings on the First Summary Judgment Motion, the Plaintiff

was left to prove (i) with respect to its actual fraud claim under §523(a)(2)(A), that Mr. Levy

justifiably relied on the Debtors when they were committing the acts that constituted mail and

wire fraud, (ii) with respect to its claim under §523(a)(4), that the Debtors committed fraud or

defalcation while acting in a fiduciary capacity, and (iii) with respect to its claim under

§523(a)(6), that the Debtors intended to or were substantially certain to injure the Plaintiff when

engaging in the acts that constituted mail and wire fraud.

## 2.    The Second Summary Judgment Motion

On March 3, 2020, the Plaintiff again moved for summary judgment (the "Second

Summary Judgment Motion").[11]  As Judge FitzSimon stated in her Memorandum Opinion

denying the Second Summary Judgment Motion, "The second motion aim[ed] to achieve by way

of proof what was missing the first time in the way of preclusion."[12]  Specifically, the Plaintiff

argued that the record established (i) the justifiable reliance element of its "actual fraud" claim

under §523(a)(2)(A), which Judge FitzSimon had previously found was not established by

collateral estoppel, and (ii) the intent to injure element of its "willful and malicious injury" claim

under §523(a)(6) claim, which Judge FitzSimon had also previously found was not established

by collateral estoppel.

With respect to the justifiable reliance element of the Plaintiff's actual fraud claim under

§523(a)(2)(A), the Court concluded that trial was required to determine what misrepresentations

the Debtors made and whether Mr. Levy had sufficient information and reason to question

---

Complaint in this adversary action does not plead embezzlement with respect to its §523(a)(4) count.
Rather, that count is limited to fraud or defalcation while acting in a fiduciary capacity.

[11] Adv. Pro. Docket No. 47.

[12] Adv. Pro. Docket No. 54.

TLA's declining financial health under Mr. Kaplan's watch.  With respect to the intent to injure element of the Plaintiff's willful and malicious injury claim under §523(a)(6), the Court found there was competing evidence regarding the Debtors' intent in undertaking the actions for which they were ultimately found liable in the District Court Action, such that trial would be required for the Court to make an informed finding.[13]

### D.    The Nondischargeability Trial

At the Nondischargeability Trial, the Court heard limited testimony from the Debtors as well as TLA's founder and President, Theodore Levy ("Mr. Levy"), each of whom the Debtors presented as part of their case-in-chief (Mr. Levy was presented as-on-cross) and admitted various documents into evidence.  Rather than present new testimony at the Nondischargeability Trial in support of the remaining elements of its claims, however, the Plaintiff elected to rely on the transcript of the District Court Action (the "District Court Transcript"), which was entered into evidence.[14]  As such, the Court's resolution of the Plaintiff's nondischargeability claims in this adversary action turns on the limited testimony in the Nondischargeability Trial and the documents entered into evidence at that trial, including the District Court Transcript.

## III.    DISCUSSION

A goal of the bankruptcy process is to provide debtors with a fresh start, and exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor.  *Linder v. Berry (In re Berry)*, 2012 Bankr. LEXIS 4668, at *8 (Bankr. W.D. Pa. Oct. 2, 2012) (*citing*

---

[13] The Court also addressed and rejected the Plaintiff's argument that the record established the Debtors committed fraud or defalcation while acting in a fiduciary capacity under §523(a)(4).  The Court concluded that this portion of the Second Summary Judgment Motion was in essence asking the Court to revisit a legal question it already addressed and rejected when ruling on the First Summary Judgment Motion, rather than citing evidence in the record that established fiduciary fraud.

[14] The District Court Transcript was admitted into evidence and was attached to the Plaintiff's Post-Trial Brief as Exhibits 1 to 4.

*Ins. Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1113 (3d Cir. 1995)).  The Plaintiff bears

the burden of proof and must prove the elements of its nondischargeability claims by a

preponderance of the evidence.  *Larson v. Bayer (In re Bayer)*, 521 B.R. 491, 499 (Bankr. E.D.

Pa. 2014); *Berry*, 2012 Bankr. LEXIS 4668, at *9 (*citing Grogan v. Garner*, 498 U.S. 279, 285,

111 S. Ct. 654, 112 L. Ed. 2d 755 (1991)).

    A.    **Actual Fraud Under §523(a)(2)(A)**

    Section 523(a)(2)(A) excepts from discharge any debt to the extent obtained by false

pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or

an insider's financial condition.  11 U.S.C. §523(a)(2)(A).

    As discussed *supra*, the Court has already ruled that the jury verdict in the District Court

Action on the Plaintiff's RICO claims against the Debtors, which found them liable for mail and

wire fraud, established the "actual" and the "fraud" components of an actual fraud claim under

§523(a)(2)(A).  The Court denied the Plaintiff summary judgment, however, on the basis that the

RICO verdict did not establish the Plaintiff's justifiable reliance, which the Court viewed as

required to be successful on the actual fraud claim.  In the Plaintiff's Post-Trial Brief, it argues

that justifiable reliance is not an element of its actual fraud claim under §523(a)(2)(A).

    In its First Summary Judgment Opinion, this Court observed that in *Husky International

Electronics v. Ritz*, 136 S. Ct. 1581, 194 L. Ed. 2d 655 (2016), the Supreme Court "recognized

that it 'has historically construed the terms in §523(a)(2)(A) to contain the elements that the

common law has defined them to include.'"[15]  This Court then stated that the *Husky* decision

"also confirmed that certain requirements, for example, justifiable reliance are still required

when a fraud is based on misrepresentation.  So, for the mail/wire fraud verdict to furnish the

---

[15] First Summary Judgment Opinion, at 8 (quoting *Husky*, 136 S. Ct. at 1586).

evidentiary basis for the actual fraud, nondischargeability claim, the other element normally associated with common law fraud; to wit, reliance, must also be present."[16]  This Court concluded that because the record in the District Court Action did not establish the reliance requirement, and "because reliance is required for fraud under Bankruptcy Code §523(a)(2)(A)[,] the evidentiary value of the prepetition RICO judgment has only partial preclusive effect."[17]

The Plaintiff argues that, contrary to the Court's reasoning, *Husky* "established that reliance is *not* an element of a §523(a)(2)(A) action based on actual fraud …[A] plaintiff opposing discharge based on actual fraud need not prove any form of reliance because the plaintiff need not plead that [the] defendant misrepresented or misled it: it need only show that the debtor contrived to cheat it of something of value (malice), intent to defraud, and resulting damages."[18]  In essence, the Plaintiff argues that because its actual fraud claim is not grounded in any misrepresentations by the Debtors to Mr. Levy or TLA, *Husky* dictates that justifiable reliance need not be proven.

The undersigned believes a closer examination of *Husky*'s holding is appropriate.  The *Husky* case came to the Supreme Court on appeal of a Fifth Circuit decision holding, in the context of asserted fraudulent conveyances by the debtor, that a necessary element of an actual fraud claim is a misrepresentation from the debtor to the creditor.  *Husky*, 136 S. Ct. at 1585-1586.  The Supreme Court reversed, holding that the term "actual fraud" in §523(a)(2)(A) encompasses forms of fraud, like the fraudulent conveyance at issue in that case, that can be effected without a false representation.  *Id.* at 1586.  The Supreme Court found support in the

---

[16] *Id.*

[17] First Summary Judgment Opinion, at 8-9 (internal citations omitted).

[18] Plaintiff's Post-Trial Brief at 40.  The Court is unclear why the Plaintiff references malice in this argument, as malice is not an element of actual fraud.

common law of fraud, which indicated that fraudulent conveyances, although a "fraud," do not require a misrepresentation from a debtor to a creditor.  *Id.* at 1587.  The *Husky* court then drew a very important distinction between what it called inducement-based frauds and frauds of concealment and hindrance:

> As a basic point, fraudulent conveyances are not an inducement-based
> fraud.  Fraudulent conveyances typically involve 'a transfer to a close
> relative, a secret transfer, a transfer of title without transfer of possession,
> or grossly inadequate consideration.'  In such cases, the fraudulent
> conduct is not in dishonestly inducing a creditor to extend a debt.  It is in
> the acts of concealment and hindrance.  In the fraudulent-conveyance
> context, therefore, the opportunities for a false representation from the
> debtor to the creditor are limited.  The debtor may have the opportunity to
> put forward a false representation if the creditor inquires into the
> whereabouts of the debtor's assets, but that could hardly be considered a
> defining feature of this kind of fraud.

*Id.*  This distinction between inducement-based frauds and frauds of concealment and hindrance makes clear that, while both fit within the universe of actual fraud, only some subset of that universe is premised on a false representation.

The question then raised is whether an actual fraud that does not entail a false representation could still somehow require reliance by the aggrieved party.  *Husky* answers this in the negative in rejecting the dissent's position that to be nondischargeable based on actual fraud, a debt had to not only result from or be traceable to fraud, but also had to result from fraud at the "inception of a credit transaction."  *Id.* at 1589-1590.  The *Husky* majority acknowledged that in *Field v. Mans*, 516 U.S. 59, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995), the Supreme Court noted that "certain forms of bankruptcy fraud require a degree of direct reliance by a creditor on an action taken by a debtor."  *Husky*, 136 S. Ct. at 1589.  Critically, however, the *Husky* majority then clarified the context in which *Field* did so: "But *Field* discussed such 'reliance' only in setting forth the requirements of the form of fraud alleged in that case – namely, fraud perpetrated through a misrepresentation to a creditor.  *The Court was not establishing a*

12

*'reliance' requirement for frauds that are not premised on such a misrepresentation.*"  *Id.* at

1589-1590 (emphasis added).  With that clarification, the undersigned believes there is only one

conclusion to be drawn from *Husky*; a claim of actual fraud under §523(a)(2)(A) that is not

premised on a misrepresentation by a debtor does not require proof of reliance as an element of

the claim.

    The Plaintiff goes too far in arguing that under *Husky*, reliance is not an element of actual

fraud.  Reliance *is* an element if the actual fraud centers on a misrepresentation by the debtor.

*See Lenchner v. Korn (In re Korn)*, 567 B.R. 280, 304 (Bankr. E.D. Mich. 2017) ("This Court

concludes that even after the Supreme Court's 2016 decision in *Husky*, justifiable reliance by the

creditor *is* a necessary element of 'actual fraud' under §523(a)(2)(A) *when* the form of fraud is

what *Husky* referred to as 'inducement-based fraud.'") (emphasis in original).  The First

Summary Judgment Opinion acknowledged this when it stated that *Husky* "confirmed that

certain requirements, for example, justifiable reliance are still required when a fraud is based on

misrepresentation."  However, the Plaintiff's actual fraud claim based on the RICO verdict does

not automatically equate to a claim premised on misrepresentation requiring proof of the

Plaintiff's reliance, as the First Summary Judgment Opinion seems to suggest.  In fact, as noted

in the First Summary Judgment Opinion, the Plaintiff was not required to prove

misrepresentations by the Debtors in order to succeed on its mail and wire fraud claims;

omissions reasonably calculated to deceive also support a finding of mail or wire fraud.

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 528 (3d Cir. 1998).

    This leads to the final piece of the analysis: if the Plaintiff's mail and wire fraud claims

under RICO were not premised on misrepresentations by the Debtors, the Plaintiff was not

required to establish reliance in connection with its §523(a)(2)(A) claim, and therefore has

already established by operation of collateral estoppel the actual fraud claim. On the other hand,

if the mail and wire fraud claims were premised on misrepresentations by the Debtors, then

reliance is an element the Plaintiff was required to prove in this adversary proceeding to succeed

on its claim for actual fraud.

The Court has reviewed the testimony and evidence in the District Court Action and the

Nondischargeability Trial and finds that the Plaintiff's mail and wire fraud claims were not

premised on misrepresentations by either Debtor to TLA or Mr. Levy. Rather, the extensive

testimony in the District Court Action and the limited testimony in the Nondischargeability Trial

establishes that the Plaintiff's fraud claims were premised on the Debtors acting in concert, while

Mr. Kaplan was at the helm of TLA and Mr. Levy was retired in Florida, to plunder the TLA's

assets for the benefit of themselves and Mrs. Kaplan's businesses. The evidence in both the

District Court Action and the Nondischargeability Trial was that after approximately 2003, Mr.

Levy was no longer actively involved in TLA's business, and Mr. Kaplan, as Executive Vice

President, had assumed control of managing the company's affairs and making decisions on its

behalf. As such, the argument that the Debtors' actual fraud was perpetrated by

misrepresentations would have to be grounded in the preposterous idea that Mr. Kaplan, in

committing actual fraud against TLA, made misrepresentations to himself, as the person in

control of TLA, on which he relied.

Rather, the evidence supports the conclusion that once Mr. Kaplan was in control of TLA

and Mr. Levy was no longer involved in its operations, the Debtors used TLA's funds,

employees, retail space, and wholesale operations to support Mrs. Kaplan's businesses and their

own personal expenses. Although too voluminous to fully summarize here, the evidence in the

District Court Action was that long after Mr. Levy had ceased to be involved in TLA's

operations, and without consulting with or even informing Mr. Levy as President and sole or

majority shareholder, the Debtors (i) insured Mrs. Kaplan's Hip Squared business using TLA

funds; (ii) established BLC New Jersey's operations by having TLA sign the lease for BLC's

retail location, by having a TLA shareholder consent prepared and executed authorizing the

amendment of TLA's bylaws to conduct business under the name of BLC New Jersey,[19] and by

having TLA register to do business in the State of New Jersey at BLC New Jersey's address in

Princeton; (iii) ordered product for Mrs. Kaplan's business that was billed to TLA but never

reimbursed by Mrs. Kaplan, (iv) used TLA's American Express account to make purchases both

for themselves and for Mrs. Kaplan's business; (v) used TLA funds to repay loans Mr. Levy had

made to them personally; (vi) allowed BLC Pennsylvania to occupy half, then all, of TLA's

retail space in Newtown, Pennsylvania without paying monthly rent; and (vii) diverted TLA's

largest wholesale customers to BLC Pennsylvania.  None of these acts were premised on

misrepresentations the Debtors made to TLA or to Mr. Levy; they were premised on actions the

Debtors took while Mr. Kaplan was running TLA's operations to misappropriate TLA funds and

other corporate assets for the benefit of themselves and Mrs. Kaplan's businesses.  Much like the

fraudulent conveyances at issue in *Husky*, these acts constitute fraud by concealment and

omissions, rather than inducement-based fraud, and any misrepresentations that the Debtors may

have made to Mr. Levy incidental to those acts "could hardly be considered a defining feature of

this kind of fraud."  *Husky*, 136 S. Ct. at 1587.  The jury verdict on the mail and wire fraud

claims, which forms the basis of the Plaintiff's actual fraud claim under §523(a)(2)(A), was

---

[19] Although there was conflicting testimony in the District Court Action regarding whether Mr. Levy signed the shareholder consent or whether someone else affixed Mr. Levy's signature without his knowledge or consent, the Court does not find that dispute material to whether actual fraud is established. The Court does, however, observe that the signature on the shareholder consent appears to vary significantly from Mr. Levy's uncontested signature on other documents that were admitted into evidence.

therefore not premised on misrepresentations by the Debtors.

As discussed at length above, where the actual fraud forming the basis of a §523(a)(2)(A) claim is not premised on a misrepresentation by a debtor, the creditor does not need to prove reliance. Because the Plaintiff's claim is not premised on a misrepresentation by the Debtors, it does not need to prove reliance, and has already proven by collateral estoppel the other elements of actual fraud. As such, the portions of the Judgments representing the Debtors' liability for mail and wire fraud under RICO, in the amount of $666,262.50 with respect to Mr. Kaplan, and $483,132.00 with respect to Mrs. Kaplan, are nondischargeable pursuant to §523(a)(2)(A). Likewise, the portion of the Judgments representing the $482,959.60 in attorneys' fees and expenses awarded to the Plaintiffs in connection with their successful RICO claims, for which the Debtors are jointly and severally liable, are also nondischargeable pursuant to §523(a)(2)(A).

### B.    False Pretenses Under §523(a)(2)(A)

Although the Plaintiff has proven that the portion of the Judgments related to the RICO claims are nondischargeable because they are based on actual fraud, the Plaintiff has also asserted that they are nondischargeable because they are based on false pretenses under §523(a)(2)(A), and therefore the Court will address that separate case of action as well.

A false pretense claim under §523(a)(2)(A) "'requires proof of an implied misrepresentation promoted knowingly and willingly that creates a misleading understanding of the transaction by the plaintiff.'" *Novartis Pharm. Corp. v. Adesanya (In re Adesanya)*, 613 B.R. 808, 828 (Bankr. E.D. Pa. 2020) (quoting *LL Lifestyle, Inc. v. Vidal (In re Vidal)*, 2012 Bankr. LEXIS 4198, at *15 (Bankr. E.D. Pa. Sept. 6, 2012)). The ability to establish false pretenses without an affirmative misrepresentation is what distinguishes a false pretenses claim from a false representation claim. An omission or failure to disclose can constitute an implied

16

misrepresentation where an omission or failure to disclose creates a false impression known to

the debtor.  *Id.*  A showing of fraudulent intent is required, and the court must look at the

debtor's intention at the time the debt arose.  *Vidal*, 2012 Bankr. LEXIS 4198, at *47-48.

My colleague Judge Chan recently noted that courts have articulated the elements of a

false pretenses claim slightly differently:

> Some courts have determined that in order for a debt to be declared
> nondischargeable based on false pretenses, plaintiffs must prove
> that: (1) the debtor impliedly made a false representation or
> engaged in deceptive conduct; (2) at the time of the representation
> or conduct, the debtor knew, or believed, the implied
> representation was false or the conduct was deceptive; (3) the
> debtor acted with an intent and purpose of deceiving the creditor;
> (4) the creditor justifiably relied upon the representation or
> conduct; and (5) the creditor sustained damage as a proximate
> result of the misrepresentation or act.  *Coluccio*, 591 B.R. at 202;
> *Johnnie's Rest. & Hotel Serv. Inc. v. Witmer (In re Witmer)*, 541
> B.R. 769, 777 (Bankr. M.D. Pa. 2015); *In re Ricker*, 475 B.R. at
> 457.
>
> Other courts have articulated those same essential elements slightly
> differently, finding that, to prove a §523(a)(2)(A) claim based on
> false pretenses, the plaintiff must show that: "(1) the [defendant]
> made an omission or implied misrepresentation; (2) promoted
> knowingly and willingly by the defendant; (3) creating a contrived
> and misleading understanding of the transaction on the part of the
> plaintiff; (4) which wrongfully induced the plaintiff to advance
> money...to the defendant."  *Carto*, 503 B.R. at 432; *In re Vidal*,
> 2012 Bankr. LEXIS 4198, 2012 WL 3907847 at *16.

*Adesanya*, 613 B.R. at 828.  Distilling both formulations, each requires an act of hidden

deception by the debtor intended to mislead the creditor, which creates a misunderstanding by

the creditor that leads to the creditor incurring damages.

The Plaintiff argues that the Debtors' RICO liability was incurred by false pretenses

because their violations "were essentially hidden: [Mr. Kaplan] presented himself as a loyal CEO

while he was actually conspiring with Nina and BLC to plunder his employer."[20]   The Plaintiff

argues that much of the conduct that constitutes the Debtors' actual fraud also constitutes false

pretenses because "The Kaplans knew their conduct was deceptive and they acted with an intent

and purpose of deceiving TLA's principal owner."[21]

    The Court, however, is not convinced.  For the same reason that the Plaintiff's actual

fraud claim does not require it to prove reliance, the Plaintiff's false pretenses claim fails: the

RICO claims were not premised on misrepresentations, overt or implied, directed towards TLA

or Mr. Levy.  Rather, they were premised on the Kaplans' concealed raiding of corporate assets,

using the mail and electronic communications, while Mr. Kaplan was in control of TLA.  The

picture painted through the testimony in the District Court Action and the Nondischargeability

Trial was that Mr. Kaplan was handed the keys to the company, and while Mr. Levy was

casually involved at times in certain deliberations or decisions, he essentially was not "minding

the store," having left it to Mr. Kaplan.  While deceptive conduct, as opposed to implied

misrepresentation, can form the basis of a false pretenses claim, the evidence does not establish

that the mail and wire fraud in which the Debtors were engaged was intended to have TLA or

Mr. Levy misunderstand any particular transaction which then led TLA or Mr. Levy to incur

damages.  In fact, as stated above, it is difficult as a logical matter to understand the assertion

that Mr. Kaplan was both in total control of TLA while at the same time engaged in deceptive

conduct or implied misrepresentations intended to mislead TLA.  While Mr. Levy remained the

President of TLA, the Plaintiff admits he was not actively involved in managing it after 2003.[22]

---

[20] Plaintiff's Post-Trial Brief at 43.

[21] *Id.* at 45.

[22] The Court pauses here to state the obvious, which is that TLA, not Mr. Levy, is the Plaintiff.

As such, the Court finds that the Plaintiff has not established the elements of a false pretenses claim under §523(a)(2)(A).

C.    **Fraud or Defalcation While Acting in a Fiduciary Capacity Under §523(a)(4)**

Section 523(a)(4) of the Bankruptcy Code excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. §523(a)(4). Section 523(a)(4) effectively presents three distinct causes of action: (1) fraud or defalcation while acting in a fiduciary capacity; (2) embezzlement; or (3) larceny. *Sibbet v. Presutti (In re Presutti)*, 540 B.R. 154, 169 (Bankr. W.D. Pa. 2015). Count II of the Complaint in this action, seeking a nondischargeability finding pursuant to §523(a)(4), states that the Debtors "incurred these debts (the Judgments) by false pretenses, false representations and actual fraud…." That allegation tracks the language of §523(a)(2) rather than §523(a)(4), and therefore makes it less than clear which cause or causes of action the Plaintiff is asserting. The Plaintiff's Post-Trial Brief focuses exclusively on the Debtors' alleged fraud or defalcation while acting in a fiduciary capacity, making no argument with respect to embezzlement or larceny.[23] To prevail on a cause of action for fraud or defalcation while acting in a fiduciary capacity, the Plaintiff must establish by a preponderance of evidence that Mr. and/or Mrs. Kaplan (1) acted in a fiduciary capacity, and (2) engaged in fraud or defalcation while acting in such capacity. *Vidal*, 2012 Bankr. LEXIS 4198, at *65.

If the Plaintiff establishes that either Debtor was in a fiduciary relationship with it within the narrow scope of §523(a)(4), the Plaintiff must also establish that such Debtor committed a fraud or defalcation in that role. In the context of §523(a)(4), fraud involves intentional deceit, rather than implied or constructive fraud. *Vidal*, 2012 Bankr. LEXIS 4198, at *67 (internal

---

[23] Adv. Pro. Docket No. 89, at §IV(D).

citations omitted).  Defalcation includes any failure to account for funds that have been entrusted to a fiduciary.  *Id.* ("For purposes of section 523(a)(4), 'defalcation' is limited to situations where a fiduciary misappropriates or otherwise fails to account for money or property held in her fiduciary capacity.")  Defalcation requires a culpable state of mind involving knowledge of, or gross recklessness with respect to, the improper nature of the relevant fiduciary behavior. *Bullock v BankChampaign, N.A.*, 569 U.S. 267, 269, 133 S. Ct. 1754, 185 L. Ed. 2d 922 (2013); *Fogg v. Pearl (In re Pearl)*, 502 B.R. 429, 440 (Bankr. E.D. Pa. 2013).  *Bullock* has been read to create two scienter levels that may constitute a nondischargeable defalcation: (1) defalcation involving bad faith, moral turpitude, or other immoral conduct (such as self-dealing), and (2) defalcation involving less culpable recklessness, *i.e.*, a conscious disregard of, or a willful blindness to, a substantial and unjustifiable risk.  *Pearl*, 502 B.R. at 440.

"Fiduciary capacity" generally has a narrower meaning in bankruptcy than its traditional common law definition.  *Vidal*, 2012 Bankr. LEXIS 4198, at *65; *Estate of Harris v. Dawley (In re Dawley)*, 312 B.R. 765, 777 (Bankr. E.D. Pa. 2004).  For purposes of §523(a)(4), a fiduciary relationship requires an express or technical trust; implied and constructive trusts imposed as a matter of law after the fact due to the conduct of the parties, does not create a fiduciary relationship.  *Vidal*, 2012 Bankr. LEXIS 4198, at *66; *Dawley*, 312 B.R. at 777.  A trust imposed as a result of the wrongful act out of which the debt arose does not fulfill the fiduciary capacity requirement - the debtor must have been a trustee before the wrong occurred and without reference to it.  *Dawley*, 312 B.R. at 777.  An express trust, created with the settlor's express intent, requires that there be (1) a trust *res*, (2) a beneficiary, and (3) a trustee obligated to administer the *res* for the benefit of the beneficiary.  *Bayer*, 521 B.R. at 507.  A technical trust, created by statute or common law, must (1) define the trust *res*, (2) spell out the trustee's

fiduciary duties to a beneficiary, and (3) impose the trust prior to and without reference to the

wrong that created the debt. *Id.* The parties must also manifest their intention to create a trust.

*Dawley*, 312 B.R. at 777.

In the Plaintiff's Post-Trial Brief, the Plaintiff did not address the existence of an express

trust at all, focusing solely on whether Mr. Kaplan acted in a fiduciary capacity with respect to a

technical trust due to his role as an officer of TLA. That argument is addressed *supra*, but the

Court first finds that no express trust existed that placed either Debtor in a fiduciary capacity,

which may explain why the Plaintiff failed to address it in its brief. First, the evidence does not

support the conclusion that TLA, which is the Plaintiff, or even Mr. Levy, who is not the

Plaintiff, had the express intent to create a trust with respect to which either Debtor would be a

fiduciary. Mr. Levy, as President and sole shareholder, appointed Mr. Kaplan as his successor to

manage TLA upon Mr. Levy's retirement. While management of TLA clearly entailed

management of its assets, no express trust was created by Mr. Kaplan's appointment. He served

as a corporate officer, with the duties and responsibilities that entailed, but there is no evidence

that either he or Mr. Levy saw that role as one of a trustee, or TLA's assets as the *res* of a trust.

Likewise, to argue that Mrs. Kaplan was the trustee of an express trust is even more of a stretch.

She did not serve in any capacity with respect to TLA, had no responsibility for its assets, and

there is no evidence that either she or Mr. Levy ever envisioned or discussed her serving as a

trustee over a *res* that consisted of TLA's assets. Simply, there can be no argument that either

Debtor acted in a fiduciary capacity with respect to an express trust.

The Plaintiff argues in its Post-Trial Brief that a technical trust may have been created by

virtue of Mr. Kaplan's role as a corporate officer of TLA.[24] The source of law that Plaintiff

---

[24] Plaintiff's Post-Trial Brief, at 55-56.

argues would support the existence of a technical trust is Pennsylvania's corporate fiduciary law holding that a corporate officer owes his employer a fiduciary duty of loyalty.[25]  Whether the Debtors were acting in a fiduciary capacity is a question of federal law, but state law determines whether the requisite trust relationship exists.  *Villas at Bailey Springs Homeowners Ass'n v. Laricci*, 2011 U.S. Dist. LEXIS 11231, at *6 (M.D. Pa. Sept. 30, 2011); *Bayer*, at 508 n.32 (while the label state law places on a relationship is not dispositive in the context of §523(a)(4), the bankruptcy court is required to "consult state law before applying the Bankruptcy Code concept of 'fiduciary.'  The critical issue is whether the characteristics of the state law duties create a fiduciary relationship under federal law.").

Plaintiff is correct in stating that Pennsylvania imposes a fiduciary duty of loyalty on its corporations' officers.  *See, e.g., Seaboard Indus., Inc. v. Monaco*, 442 Pa. 256, 262 (Pa. 1971); *Lutherland, Inc. v. Dahlen*, 53 A.2d 143, 147 (Pa. 1947) ("[O]fficers and directors are deemed to stand in a fiduciary relation to the corporation.  They must devote themselves to the corporate affairs with a view to promote the common interests and not their own, and they cannot, either directly or indirectly, utilize their position to obtain any personal profit or advantage other than that enjoyed also by their fellow shareholders.").  In fact, corporate officers are also statutorily charged with a duty of care and good faith.  *See* 15 Pa. C.S. §512(c) ("Except as otherwise provided in the articles, an officer shall perform his duties as an officer in good faith, in a manner he reasonably believes to be in the best interests of the corporation, and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances.").

The fact that an officer of a Pennsylvania corporation is a fiduciary, however, does not

---

[25] *Id.* at 56.  In the District Court Action, the Parties' stipulated that TLA is a Pennsylvania corporation.

necessarily establish that they were acting in a fiduciary capacity under §523(a)(4), as found by numerous courts in this Circuit. *See Bayer*, 521 B.R. at 512 (following *Dawley* and *In re Johnson*, 242 B.R. 283 (Bankr. E.D. Pa. 1999) in rejecting *per se* rule that corporate officers or directors are fiduciaries under §523(a)(4) in jurisdictions in which their obligations are those of loyalty and good faith); *Laricci*, 2011 U.S. Dist. LEXIS 11231, at *6 (acknowledging a split among courts on the issue but noting that "[t]he majority of recent decisions in the bankruptcy and district courts of this Circuit have held that the general fiduciary duties of corporate officers and directors are insufficient to establish a fiduciary capacity under §523(a)(4).") (internal citations omitted). Given the narrow nature of the exceptions to discharge generally and the concept of fiduciary capacity under §523(a)(4) in particular, this Court agrees with the *Laricci* court that the general duties of good faith, loyalty, and fair dealing imposed on corporate officers under Pennsylvania law are insufficient alone to show officers acted in a fiduciary capacity over a technical trust. The Plaintiff has not cited any other statutory or common law that defines a trust *res* with respect to TLA's assets or sets forth specific, affirmative fiduciary duties of Mr. Kaplan as an officer of TLA. As such, the Plaintiff has failed to establish that Mr. Kaplan acted in a fiduciary capacity within the narrow meaning of §523(a)(4).

### D.      Embezzlement Under §523(a)(4)

Although the Plaintiff did not address embezzlement in its Post-Trial Brief at all, in its first motion for summary judgment it argued that embezzlement was established by the jury's finding of liability on the Plaintiff's conversion claim in the District Court Action.[26] The Court rejected that argument, and upon review of the evidence now finds the Plaintiff did not prove that any portion of the Judgments are nondischargeable because they represent debts incurred

---

[26] Adv. Pro. Docket No. 27-2, at §III(5).

through the Debtors' embezzlement.

Embezzlement pursuant to §523(a)(4) requires proof of: (1) entrustment, (2) of property (3) of another (4) that is misappropriated (used or consumed for a purpose other than for which it was entrusted), (5) with fraudulent intent. *Compton v. Moschell (In re Moschell)*, 2020 Bankr. LEXIS 2829, *11 (Bankr. W.D. Pa. Oct. 9, 2020); *Islinger v. Hillisheim*, 2011 Bankr. LEXIS 1326, at *9 (Bankr. D.N.J. 2011). The Court has identified no evidence adduced in the District Court Action or the Nondischargeability Trial, and the Plaintiff has cited none, which would support a finding that TLA entrusted its property to either Debtor. In fact, an assertion underpinning the Plaintiff's actual fraud claim is that the Debtors raided TLA's assets and concealed their actions from Mr. Levy. This would seem to be inconsistent with an embezzlement claim because the embezzler's initial acquisition of the property at issue is lawful. *Islinger*, 2011 Bankr. LEXIS 1326, at *10. Here, Mr. Kaplan did not lawfully acquire TLA's property; he managed it, as an officer of the company. Likewise, Mrs. Kaplan did not lawfully acquire TLA's property; she was never even given management or control of TLA's property as an officer. Because the Court finds no evidence that TLA, or even Mr. Levy, entrusted either Debtor with TLA's property, the Plaintiff's embezzlement claim under §523(a)(4) fails.

### E.    Willful and Malicious Injury Under §523(a)(6)

The Plaintiff seeks a determination that the Judgments against both Debtors for RICO violation and conversion, as well as the Judgment against Mr. Kaplan for breach of fiduciary duty and tortious interference with contractual relations, are nondischargeable pursuant to §523(a)(6)'s "willful and malicious injury" exception to discharge. As discussed *supra*, the First Summary Judgment Opinion concluded that the jury verdict in the District Court Action against the Debtors on the Plaintiff's RICO claims established willful conduct that was malicious but did

not establish that the willful and malicious conduct was intended or substantially certain to cause

injury.  The First Summary Judgment Opinion did not make any findings regarding the

application of §523(a)(6) to the portions of the Judgments not related to the Debtors' RICO

liability.

Section 523(a)(6) excepts from an individual debtor's discharge any debt "for willful and

malicious injury by the debtor to another entity or to the property of another entity."  11 U.S.C.

§523(a)(6).  The phrase "willful and malicious" as used §523(a)(6) is narrowly defined.  *Nat'l*

*Fertilizers, Ltd. v. Vepuri (In re Vepuri)*, 2009 Bankr. LEXIS 2781, at *18-19 (Bankr. E.D. Pa.

2009) (*citing Kawaauhau v. Geiger*, 523 U.S. 57, 63, 118 S. Ct. 974, 140 L. Ed. 2d 90 (1998)).

A debtor's actions can only be "willful and malicious" under §523(a)(6) "'if they either have a

purpose of producing injury or have a substantial certainty of producing injury.'"  *Id.* (*quoting In*

*re Conte*, 33 F.3d 303, 307 (3d Cir. 1994)).  Merely because a debtor's conduct may have had

"'a high probability of producing harm . . . does not establish that his conduct was substantially

certain to produce [an] injury.'"  *Harris v. Kamps (In re Kamps)*, 575 B.R. 62, 73 (Bankr. E.D.

Pa. 2017) (*quoting In re Conte*, 33 F.3d 303, 307 (3d Cir. 1994)).

As such, willful injury requires a deliberate or intentional injury, not merely a

deliberate or intentional act that leads to injury.  *Id.* (*quoting Kawaauhau*).  A party seeking a

nondischargeability determination must show that the debtor actually intended to injure the party

or its property; negligent or reckless acts do not suffice to establish that a resulting injury is

willful and malicious.  *Schlessinger v. Schlessinger (In re Schlessinger)*, 208 Fed. Appx. 131,

134 (3d Cir. 2006) (*citing Kawaauhau*); *Corcoran v. McCabe (In re McCabe)*, 588 B.R. 428,

433 (E.D. Pa. 2018) ("A debt is non-dischargeable under §523(a)(6) if the debt arises from an act

done with 'actual intent to cause injury,' meaning there must have been a 'deliberate or

intentional injury ….'") (*quoting Kawaauhau*).  Malicious injury requires (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.  *Id.* (*quoting In re Barboza*, 545 F.3d 702, 706 (9th Cir. 2008)).  A showing of specific malice is not required, and an injury can be malicious even in the absence of personal hatred, spite, or ill-will.  *Kamps*, 575 B.R. at 73.  However, in order to establish that an injury is malicious under §523(a)(6), the aggrieved party must prove that the debtor's conduct was motivated by some purpose other than the maximization of the debtor's personal financial interests.  *Sherwin Williams Co. v. Grasso (In re Grasso)*, 487 B.R. 434, 447 (Bankr. E.D. Pa. 2013) (*citing Jacobs*, 381 B.R. at 147).  In sum, in order to succeed on its claim that the Debtors are liable for willful and malicious injury under §523(a)(6), the Plaintiff must prove by a preponderance of the evidence that the Debtors intentionally caused injury to the Plaintiff through a wrongful act done intentionally, without just cause or excuse, motivated by some purpose other than their own financial gain.

### a.    Judgment on the RICO Claims Against Both Debtors

The Court first addresses the RICO portion of the Judgments, *i.e.* mail and wire fraud, because following the First Summary Judgment Opinion, all that was left to prove is that the Debtors intended to injure the Plaintiff or their actions were substantially certain to cause injury to the Plaintiff.  Based on the evidence in the District Court Action, there were a multitude of acts by the Debtors that together constituted their mail and wire fraud, including (i) insuring Mrs. Kaplan's Hip Squared business using TLA funds; (ii) establishing BLC New Jersey's operations by having TLA sign the lease for BLC's retail location, having a TLA shareholder consent prepared and executed authorizing the amendment of TLA's bylaws to conduct business under the name of BLC New Jersey, and having TLA register to do business in the State of New Jersey

at BLC New Jersey's address in Princeton; (iii) ordering products for Mrs. Kaplan's business that was billed to TLA but never reimbursed by Mrs. Kaplan, (iv) using TLA's American Express account to make purchases both for themselves and for Mrs. Kaplan's business; (v) using TLA funds to repay loans Mr. Levy had made to them personally; (vi) allowing BLC Pennsylvania to occupy half, then all, of TLA's retail space in Newtown, Pennsylvania without paying monthly rent; and (vii) diverting TLA's largest wholesale customers to BLC Pennsylvania.

The Court concludes that these acts, taken as a whole, establish the Debtors' intent to injure TLA, or at least the substantial certainty that they would injure TLA. The Debtors could not have committed these acts without knowing that TLA was going to be injured as a result. For example, the Debtors had to understand that by BLC occupying TLA's retail space without paying full rent, and sometimes no rent at all, TLA would suffer injury. Likewise with respect to ordering products for BLC using TLA credit and diverting TLA wholesale customers to BLC. These actions were not done without the understanding, at the least, that TLA would be injured as a result, whether that was the Debtors' intent or not. *See In re Fugazy*, 157 B.R. 761, 766 (Bankr. S.D.N.Y. 1993) (finding RICO judgment against the debtor for mail and wire fraud was nondischargeable under §523(a)(6) because, *inter alia*, engaging in mail and wire fraud necessarily produces harm). This is enough to establish intent to injure for purposes of §523(a)(6), and therefore the portion of the Judgments related to the RICO violations are nondischargeable. As found *supra,* those amounts are $666,262.50 with respect to Mr. Kaplan, and $483,132.00 with respect to Mrs. Kaplan, as well as the $482,959.60 in attorneys' fees and expenses awarded to the Plaintiffs in connection with their successful RICO claims, for which the Debtors are jointly and severally liable.

b.    **Judgment on the Conversion Claims Against Both Debtors**

The jury in the District Court Action found each Debtor liable for conversion, in the amount of $100,000.00 each.  The District Court instructed the jury that conversion is the deprivation of another person's or party's interest in property or right in property or use or possession of tangible personal property, or other interference without the owner's consent and without lawful justification.

In the Plaintiff's Post-Trial Brief, it argues that "the conversion count relates to [the Debtors] taking merchandise that TLA paid for and using it as inventory for [Mrs. Kaplan's] business, BLC.  That action was willful because it involved deliberate and intentional conduct, *i.e.*, using TLA funds to purchase merchandise for the use of BLC and, in some cases, simply stealing TLA's own inventory and shipping it to BLC's Amazon customers.  The [Debtors'] actions were malicious because they involved wrongful action without just cause or excuse as [Mr. Kaplan] used TLA's funds to buy inventory for his wife's business, and she took that inventory…The harm to TLA from using its funds to purchase inventory for BLC, and from having its own inventory used to fulfill BLC's sales, is certain."[27]

The Court finds that the Debtors' conversion of TLA's inventory, whether by ordering inventory on TLA's account without reimbursement from BLC or by using TLA inventory to fill orders of BLC's customers, satisfies the elements of willful and malicious injury.  Conversion clearly satisfies the wrongful act requirement.  The Debtors did not engage in these practices negligently or recklessly, they did so intentionally.  Moreover, the Court finds that the Debtors' conversion of TLA's inventory could only have been done with intent to injure TLA; there can be no reasonable argument that the Debtors engaged in this practice motivated solely by their

---

[27] Plaintiff's Post-Trial Brief, at 53.

own financial gain and indifferent to the harm TLA would suffer as a result.  Consequently, the

portions of the Judgments related to the conversion claim against each Debtor, each in the

amount of $100,000.00, are nondischargeable because they represent debts for willful and

malicious injury under §523(a)(6).

c.    **Judgment on the Tortious Interference with Contractual
Relations Claim Against Mr. Kaplan**

Finally, the jury found Mr. Kaplan liable for tortious interference with contractual

relations and assessed resulting damages of $100,000.00.

The Plaintiff argues that the claim relates to the diversion of TLA's wholesale customers

in the last three months of Mr. Kaplan's employment, and the liability is nondischargeable: "The

diversion of TLA's wholesale customers was willful because it involved deliberate and

intentional conduct, *i.e.*, contracting wholesale sales to TLA's historical customers on behalf of

BLC.  [Mr. Kaplan's] actions were malicious because they involved wrongful action without just

cause or excuse as [Mr. Kaplan] was still employed by TLA and was using its confidential

business information when he diverted TLA's wholesale sales to [Mrs. Kaplan's] business."[28]

The Court finds that Mr. Kaplan's actions that formed the basis for the tortious

interference with contractual relations claim also establish willful and malicious injury.  The

evidence in the District Court Action established that, at some point in time prior to his

termination from TLA, Mr. Kaplan was leveraging TLA's existing wholesale customers to create

customer relationships for BLC.  TLA's customers not only then purchased from BLC prior to

Mr. Kaplan's termination from TLA, but then stayed with BLC after his termination.  Moreover,

the evidence showed that upon his termination from TLA, Mr. Kaplan attempted to deprive TLA

---

[28] Plaintiff's Post-Trial Brief, at 54.

of its own information and files regarding its wholesale customers by removing the physical

copies of the files from TLA's offices and attempting to wipe such customer information from

his TLA computer.  These actions strike the Court as the epitome of willful and malicious injury.

Mr. Kaplan took these actions intending to injure TLA or with the substantial certainty that they

would hurt TLA.  He had no excuse or just cause for doing so, and as an officer of TLA knew

that such information belonged to TLA.  And, as with his conversion of TLA inventory, while

Mr. Kaplan may have been partly motivated by the financial benefit to himself and Mrs. Kaplan

through BLC, he could not have engaged in the acts that constitute tortious interference while

indifferent to the harm they would inflict on TLA.  The portion of the Judgment against Mr.

Kaplan related to the tortious interference with contractual relations claim, in the amount of

$100,000.00, is nondischargeable because it represents a debt for willful and malicious injury

under §523(a)(6).

> ### d.    Judgment on the Breach of Fiduciary Duty Claim Against Mr. Kaplan

The jury found Mr. Kaplan liable for breach of his fiduciary duty to TLA and assessed

damages of $100,000.00 against him.  The Plaintiff argues that the totality of Mr. Kaplan's

actions that constituted a breach of his fiduciary duty to TLA also constitute willful and

malicious injury to TLA: "Everything [Mr. Kaplan] did abusing his confidential relationship

with TLA to benefit [Mrs. Kaplan's] business at the expense of TLA – from using TLA funds to

set up the New Jersey store for [Mrs. Kaplan] then giving it to her outright, to using TLA's funds

for BLC's unreimbursed purchases, to permitting [Mrs. Kaplan] to avoid rent payments which

TLA covered, to using TLA's funds to pay personal expenses and obligations, to diverting

TLA's wholesale business to BLC – involved deliberate and intentional misconduct and was

wrongful.  And every instance was certain to injure TLA because every action involved misusing

its funds for improper purpose."[29]

The Court finds that the same course of conduct that served as the basis for the Plaintiff's

mail and wire fraud claims, conversion claim, and tortious interference claim, served as the basis

for its breach of fiduciary duty claim, and constitutes willful and malicious injury to TLA.  Mr.

Kaplan, as an officer of TLA and the individual in control of the entity, engaged in a series of

acts and practices, as detailed *supra*, that breached his duties of care, loyalty, and good faith to

TLA.  Those acts and practices were not done negligently or recklessly, they were done

intentionally, without just cause or excuse, and with either intent to harm TLA or substantial

certainty that they would.  As such, the portion of the Judgment against Mr. Kaplan for breach of

his fiduciary duty to TLA, in the amount of $100,000.00, constitutes a debt for willful and

malicious injury to TLA, and is nondischargeable pursuant to §523(a)(6).

## IV.    CONCLUSION

For the reasons set forth *supra,* the Court finds that the Judgments against the Debtors are

excepted from discharge pursuant to §§523(a)(2)(A) and 523(a)(6) of the Bankruptcy Code.  The

Court further finds that the Judgments are not excepted from discharge pursuant to §523(a)(4).

An Order consistent with this Memorandum Opinion will be entered.

Dated:  August 30, 2021

_____
MAGDELINE D. COLEMAN
CHIEF U.S. BANKRUPTCY JUDGE

Leslie B. Baskin, Esquire
Daniel J. Dugan, Esquire
Spector Gadon Rosen
Seven Penn Center – 7th Floor
1635 Market Street
Philadelphia, PA 19103

---

[29] Plaintiff's Post-Trial Brief, at 54-55.

Paul J. Winterhalter, Esquire
Offit Kurman, P.A.
Ten Penn Center
1801 Market Street, Suite 2300
Philadelphia, PA 19103